422 S.E.2d 624 (1992)
188 W.Va. 57
Robert L. MACE, Plaintiff Below, Appellee,
v.
CHARLESTON AREA MEDICAL CENTER FOUNDATION, INC., a West Virginia Corporation, Defendant Below, Appellant.
No. 20123.
Supreme Court of Appeals of West Virginia.
Submitted January 28, 1992.
Decided July 15, 1992.
*627 Fred F. Holroyd, Brian D. Yost, Holroyd & Yost, Charleston, for appellant.
John A. Kessler, James A. McKowen, Hunt & Wilson, Charleston, for appellee. *625
*626 BROTHERTON, Justice:
The appellee, Robert L. Mace, filed a lawsuit against the appellant, Charleston Area Medical Center Foundation, Inc. (CAMC), alleging breach of an employment contract and retaliatory discharge. The case was tried before a six person jury which found for Mace on both counts and awarded him $55,700.29 in damages for lost wages, $50,000.00 for emotional distress, and $125,000.00 in punitive damages. CAMC now appeals from the judgment order which was entered by the Circuit Court of Kanawha County on January 19, 1990.
Mace began working as a pharmacy technician at CAMC in January, 1981. He did not receive any specialized training for this job; instead, "they trained you as you went." Mace's duties as a pharmacy technician
included filling drug carts each day according to patient profiles, filling employee prescriptions, preparing intravenous medications, and copying doctors' written orders for individual patients.[1]
In July, 1985, Mace informed his employers that he had joined the National Guard and would report for active duty on August 1, 1985. At that time, CAMC's personnel director, Kris Lyon, told Mace that his job would be posted if he was gone for more than thirty days. According to Mace, his wife spoke with management-level employees at CAMC twice during his thirteenweek basic training period and told them that Mace's position was protected by federal law while he was serving in the Guard. Nevertheless, while he was away, Mace's position as a pharmacy technician was eliminated.
Following thirteen weeks of active duty, Mace applied for reemployment at CAMC on November 8, 1985. He was informed that he could be placed in another position of like status, seniority, and pay until he could be returned to the position of pharmacy technician. Mace refused to accept a position as nursing attendant at CAMC's General Division and insisted upon having his former job back. The United States Department of Labor interceded on Mace's behalf, and he was reinstated to his original position on December 9, 1985, after another employee was transferred out of a pharmacy technician post. However, Mace's efforts to collect back pay continued for nearly a year and a half.[2]
In July, 1986, Mace injured his back while off on his annual active duty training with the National Guard. He did not return to work until September 8,1986. During his time off, he began taking several medications prescribed by his family physician, Jerry Edens, M.D., for back pain. At *628 the hospital on September 12, 1986, Mace refused to obey an order that he take a drug cart up to the next floor. He later went to Employee Health and complained of back pain, and he was sent home early that day.
Mace returned to work on September 16, 1986, and received a written warning regarding his insubordination. At trial, Mace admitted that he refused to move the drug cart and that he occasionally used profanity. Several coworkers also testified that Mace had seemed different since his return to work. For example, Terri Steele Spencer, who was Mace's supervisor at the time, stated that he "seemed to be ... disturbed about something" and "he would often be muttering obscenities to himself."
On September 23, 1986, Mace took his medication on an empty stomach after he arrived to work at the hospital. He became sleepy, dizzy, and unable to concentrate, so he went to Employee Health, where he was examined by Dr. Willard Pushkin. Mace hoped that he would be sent home. According to Pushkin, Mace's speech was slurred, he appeared off-balance, and his eyelids were droopy. Pushkin stated, "I couldn't tell if it was an overdose. I felt that it was an excess."
Instead of sending Mace home, Dr. Pushkin instructed him to report to Kris Lyon in the Personnel Department for a drug screen. When he was asked at trial what he would have done with the drug screen results, Pushkin stated that "... if the drug screen was significant in terms of concentration, or if it suggested the possibility that he was on medication over a chronic period, they [CAMC] would have arranged for a rehabilitative participation for him."
When Mace met with the personnel director, Kris Lyon, he gave her a list which contained the names of nine drugs he was then taking. Mace refused to take a urine screen and told Lyon that he would do so only if it was required of everyone in the pharmacy department. Mace was told that he would be fired if he refused to be tested, but that he could go home and think about whether he would submit to the drug screen the next day. Lyon told him she would phone him later in the day. She called at approximately 4:00 P.M. and told Mace that she wanted to have a meeting with him at 8:00 A.M. the next morning in her office.
Mace met with Lyon the next morning, September 24, 1986, and he gave her the names of five additional drugs he was taking. Mace states that he asked Lyon to check with Dr. Edens and verify the drugs and their known side effects, but she refused. Mace was again advised that he was required to submit to a drug screen and that his failure to do so would result in the termination of his employment. Once again, Mace refused. At trial, Mace explained that although he was tempted to go ahead and submit to the screen because he had a family to support, he felt he was being singled out and punished by CAMC for asserting his rights under the Veterans' Reemployment Rights Act and pursuing his ongoing claim for back pay.
Instead of being fired, Mace asked Lyon if he could submit a letter of resignation, and she agreed. Mace testified that his only options were to be fired or resign, and because "it would have been real hard to find a job as a pharmacy technician" after being fired for refusing to take a drug test, Mace preferred to resign. Within a matter of days, however, Mace contested his "resignation."
Pursuant to CAMC policy, Mace appealed his dismissal to a hospital grievance committee. Testimony was taken from all parties involved in the decision to terminate Mace, and the grievance committee made the following recommendations: (1) that Mace be reinstated after a two-week suspension; (2) that he be referred to Employee Assistance; (3) that a thorough investigation of Mace's allegations against the pharmacy be made; and (4) that CAMC make a clear written statement of their drug testing policy. CAMC management chose not to follow the grievance committee's recommendation that Mace be reinstated.[3]
*629 CAMC maintains that because of Mace's appearance and actions on September 23, 1986, as well as his own admission that his physical condition that day resulted from drugs he had taken, it was important for them to immediately determine the exact nature of Mace's problems and ascertain whether he was a candidate for the Employee Assistance Program, whether he had a drug problem, and whether he was possibly taking illegal drugs or drugs obtained from the hospital pharmacy. In light of these facts, CAMC argues that it acted reasonably and properly in requiring Mace to submit to a drug screen.
It is Mace's contention that asking him to submit to a drug screen constituted a breach of contract by CAMC because this requirement was not set forth in the Employee Handbook. However, CAMC maintains that the Employee Handbook was not a contract, and argues that a drug testing policy existed and was in effect, even though it was not written out in specific detail in the handbook. According to CAMC, the handbook also made it clear that addiction, possession, or unauthorized use or disposal of drugs were grounds warranting immediate discharge.
Further, CAMC points out that an employee's willful disobedience, insubordination, or intentional failure to carry out any reasonable order is also grounds for an immediate discharge and was, in fact, a valid, nondiscriminatory reason for Mace's discharge in this case. However, Mace states that in finding for him on the charge of retaliatory discharge, the jury concluded that the real reason he was fired was in retaliation for his persistence in asserting his rights under the Veterans Reemployment Rights Act.
On appeal, the appellant, CAMC, alleges numerous assignments of error related to both the breach of contract and retaliatory discharge claims, as well as the award of damages. First, we examine the breach of contract issue.

I. BREACH OF CONTRACT
CAMC now argues that the Employee Handbook did not constitute a contract because it contained a contract disclaimer and a statement of at-will employment. Specifically, page three of the handbook contained the following statements under the heading "YOUR HANDBOOK":
... Because of court decisions in some states, it has become necessary for us to make it clear that this handbook is not part of a contract, and no employee of the Medical Center has any contractual right to the matters set forth in this handbook. In addition, your employment is subject to termination at any time either by you or by the Medical Center.
* * * * * *
This handbook is not designed to be a total departmental manual; therefore, not all rules and regulations are listed herein.
In addition, under a section titled "TERMINATION OF YOUR EMPLOYMENT," on page 56, the handbook provides that, "Since employment at CAMC is based on mutual consent, either the employee or the employer is privileged to terminate employment." Also, a section titled "DISCIPLINARY GUIDELINES" contains the following explanation at pages 57-58:
It is the responsibility of management to make and enforce reasonable rules to increase or maintain efficiency. The Medical Center could never list all acts, omissions and behaviors that a good employee is expected to avoid. There are far too many variations, special applications and situations. We have, however, listed some basic things here that are viewed as unacceptable behavior. This list in no way attempts to cover all possible situations, but includes examples *630 of improper conduct. It should not in any way be considered a restriction on the right of CAMC to establish future policy or to apply disciplinary measures to cases other than those listed. (Emphasis added.)
In West Virginia, the law presumes that employment is terminable at will, permitting an employer to discharge an employee for cause, for no cause, or even for wrong cause.[4] "When a contract of employment is of indefinite duration it may be terminated at any time by either party to the contract." Syl. pt. 2, Wright v. Standard Ultramarine and Color Co., 141 W.Va. 368, 90 S.E.2d 459 (1955). However, "[c]ontractual provisions relating to discharge or job security may alter the at will status of a particular employee." Syl. pt. 3, Cook v. Heck's, Inc., 176 W.Va. 368, 342 S.E.2d 453 (1986). Thus, employees sometimes argue that they have a unilateral employment contract because of what they perceive as promises of job security contained in an employee handbook.
In syllabus point 6 of Cook, we recognized that "[a]n employee handbook may form the basis of a unilateral contract if there is a definite promise therein by the employer not to discharge covered employees except for specified reasons." We further delineated our position on this point in Suter v. Harsco Corp., 184 W.Va. 734, 403 S.E.2d 751 (1991), in which we stated that "[a]n employer may protect itself from being bound by any and all statements in an employee handbook by placing a clear and prominent disclaimer to that effect in the handbook itself." Id. at syl. pt. 5. We also added that "[a]n employer may protect itself... by providing in the employment handbook that the handbook's provisions are not exclusive." Id. at syl. pt. 4. Thus, a disclaimer clearly displayed in the handbook can preserve the at will status of the employment.
"Generally, the existence of a contract is a question of fact for the jury." Syl. pt. 4, Cook v. Heck's, Inc., 176 W.Va. 368, 342 S.E.2d 453 (1986). However, a trial court may remove an issue from jury consideration if a prima facie case is lacking. "When the plaintiff's evidence, considered in the light most favorable to him, fails to establish a prima facie right of recovery, the trial court should direct a verdict in favor of the defendant." Syl. pt. 3, Roberts v. Gale, 149 W.Va. 166, 139 S.E.2d 272 (1964).
CAMC maintains that they were entitled to a directed verdict or judgment notwithstanding the verdict on the breach of contract issue, and we agree. In order to form the basis of a unilateral contract, a handbook must contain a "definite promise" not to fire a covered employee except for specified reasons. Cook, 342 S.E.2d at 459. An employee handbook which contains a clear and conspicuous disclaimer of job security will preserve the at-will status of the employment relationship.
In this case, the CAMC Employee Handbook did not contain any definite promises that employees would be discharged only for specified reasons. In fact, CAMC made it quite clear that the opposite was true, and Mace signed an acknowledgement on February 28, 1986, indicating that he accepted the employee handbook, which contained both the disclaimer and the employment at will language. Because we conclude that the Employee Handbook did not constitute a contract of employment between CAMC and Mace, we reverse the lower court's judgment on the breach of contract claim.

II. RETALIATORY DISCHARGE
A second theory of liability advanced at trial involved Mace's allegation that CAMC actually discharged him because he exercised his rights under the Veteran's Reemployment Rights Act, and thus his firing contravened substantial public policy. As we noted above, Mace was not reinstated to his pharmacy technician position for approximately one month after *631 he completed his initial basic training stint with the National Guard. According to the appellee, "even that required prodding by the United States Department of Labor."
After he returned to work, Mace attempted to collect back wages for the period between his return from basic training and his return to his old job. However, Mace states that he did not receive the back wages for approximately one and onehalf years, and only then after collection efforts were initiated by both the Department of Labor and the Department of Justice. Mace also explains that his back injury slowed him down a bit at work and, although he attempted to explain this to his superiors, they were unsympathetic. In addition, he received a job evaluation which he considered unfairly critical of him in certain respects, and he thought the aforementioned written warning for insubordination was unfair in light of his back pain.
CAMC defends its discharge of Mace and maintains that he was discharged for valid nondiscriminatory reasons unrelated to his actions in seeking redress under the Veterans Reemployment Rights Act. First and foremost, CAMC maintains that the evidence is undisputed that they had probable cause and a reasonable good faith objective suspicion that Mace was using drugs. Further, CAMC points out that the original decision and recommendation that Mace submit to a drug screen was made by Dr. Pushkin, a physician at CAMC, and not by CAMC's Personnel Department.
To support their argument, CAMC cites McClung v. Marion County Commission, 178 W.Va. 444, 360 S.E.2d 221 (1987), in which this Court stated, at syllabus point 3, that:
In a retaliatory discharge action, where the plaintiff claims that he or she was discharged for exercising his or her constitutional right(s), the burden is initially upon the plaintiff to show that the exercise of his or her constitutional right(s) was a substantial or a motivating factor for the discharge. The plaintiff need not show that the exercise of the constitutional right(s) was the only precipitating factor for the discharge. The employer may defeat the claim by showing that the employee would have been discharged even in the absence of the protected conduct.
CAMC argues that Mace did not meet his initial burden under McClung by showing that his persistence in getting his old job back or his pursuit of back pay was a substantial or motivating factor in his dismissal. However, even if a jury could find that Mace met this burden, CAMC argues that they defeated his claim by showing that he would have been discharged even in the absence of his exercise of his rights under the Veterans Reemployment Rights Act. CAMC maintains that Mace was treated no differently than other employees who were required to submit to drug testing in the past and that their own written policy gave CAMC the right to discharge Mace for refusing to submit to the drug screen.
CAMC's written drug policy, or lack thereof, is not the issue now before this Court. Our concern lies solely with Mace's allegations of retaliatory discharge, and CAMC's request that we set aside the jury verdict in Mace's favor on this issue.
"One of the fundamental rights of an employee is the right not to be the victim of a `retaliatory discharge,' that is, a discharge from employment where the employer's motivation for the discharge is in contravention of a substantial public policy." McClung, 360 S.E.2d at 227. In the syllabus of Harless v. First National Bank in Fairmont, 162 W.Va. 116, 246 S.E.2d 270 (1978), we stated that:
The rule that an employer has an absolute right to discharge an at will employee must be tempered by the principle that where the employer's motivation for the discharge is to contravene some substantial public policy principle, then the employer may be liable to the employee for damages occasioned by this discharge.
CAMC's motivation in this case was clearly a question of fact to be resolved by the jury, and thus, we agree with the trial court's decision to permit the issue of *632 whether there was a retaliatory discharge in this case to go to the jury.
Whether CAMC had an ulterior motive in requiring that Mace either submit to a drug screen or be fired was the subject of much conflicting evidence which was presented at trial. The jury heard lengthy testimony from Mace detailing his efforts, first to get his job back, and then to get the back pay he felt he was entitled to receive. In addition, Mace testified about the strained working atmosphere he encountered at CAMC, especially after he joined the National Guard.
In syllabus point 5 of Orr v. Crowder, 173 W.Va. 335, 315 S.E.2d 593 (1983), cert. denied, 469 U.S. 981, 105 S.Ct. 384, 83 L.Ed.2d 319 (1984), we summarized the tests for determining whether evidence is sufficient to support a jury's verdict:
In determining whether there is sufficient evidence to support a jury verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved.
CAMC argues that it was entitled to judgment notwithstanding the verdict in this case. However, such a motion "may be granted only when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment. Where there is sufficient conflicting evidence, or insufficient evidence to conclusively establish the movant's case, judgment notwithstanding the verdict should not be granted." McClung, 360 S.E.2d at 230-31.
The facts now before us were clearly not amenable to simple resolution. However, we find that there was sufficient evidence to support the jury's verdict against CAMC on the issue of retaliatory discharge. Perhaps most damaging to CAMC's case was their refusal to follow their own grievance committee's recommendation that Mace be reinstated following a two-week suspension, even though there was no evidence that Mace had ever used illegal drugs. In addition, the fact that the jury awarded $125,000.00 in punitive damages for the express purpose of "punishing" CAMC for its discharge of Mace is a strong indication that the jury believed Mace's firing was unjust.
Although evidence presented at trial might conceivably have led the jury to conclude that CAMC was within its rights in firing Mace for refusing to take the drug screen, the trial court "was not entitled to substitute its opinion for the opinion of the jury on evidence giving rise to inferences about which reasonable minds could differ" by granting CAMC's motion for judgment notwithstanding the verdict. Id., 360 S.E.2d at 231. Therefore, we must affirm the jury's conclusion that CAMC was guilty of retaliatory discharge.

III. DAMAGES
The final area of controversy on appeal involves the jury's award of damages. As we indicated above, Mace received judgment in the amount of $55,770.29 for lost wages, $50,000.00 for emotional distress, and $125,000.00 in punitive damages. CAMC argues that this award is excessive and not supported by the law or the evidence submitted at trial.
Lost wages were recoverable by Mace on either of his theories of liability, breach of contract or retaliatory discharge. CAMC contends that even if Mace was entitled to lost wages, the award should have only been approximately $35,250.80, which is $20,000.00 less than the actual award. However, CAMC's computation of lost wages fails to take into account any compensation for lost benefits over the time period in question. Counsel for Mace clearly instructed the jury to consider these lost benefits when making its calculation.[5]
*633 CAMC also suggests that the award for lost wages should have been reduced by $10,600.00, which Mace's wife testified was the amount he earned from various jobs he held after his discharge from CAMC. CAMC argues that the $10,600.00 constitutes mitigation and must be deducted from the award, consistent with our decision in Mason County Board of Education v. State Superintendent of Schools, 170 W.Va. 632, 295 S.E.2d 719, 723 (1982), in which we held that courts must consider mitigation of damages in cases of wrongful discharge. "[A]ctual wages received, regardless of their source, are always an offset to damages unless they were earned in a job entirely compatible with continued employment under the contract." Id. at 725. However, we also emphasized that "in those cases where an employee has been wrongfully discharged out of malice, by which we mean that the discharging agency or official willfully and deliberately violated the employee's rights under circumstances where the agency or individual knew or with reasonable diligence should have known of the employee's rights, then the employee is entitled to a flat back pay award." Id.
In this case, CAMC did not put forth a strong argument on the issue of mitigation, which is an affirmative defense. In fact, mitigation was not even mentioned in closing arguments. However, there was some testimony presented concerning income Mace earned after the CAMC termination which the jury might have considered as mitigation, had it chosen to do so. Obviously, it did not, perhaps because of its desire to "punish" CAMC for its treatment of Mace, which was certainly apparent in its awards for emotional distress as well as punitive damages. The jury was not bound to consider mitigating income, particularly if it perceived that CAMC had engaged in willful and wanton behavior in discharging Mace. Therefore, we will not disturb the jury's award of $55,770.29 for lost wages.
Next, we examine the jury's decision to award Mace $50,000.00 to compensate him for the emotional distress that resulted from his termination by CAMC. In syllabus point 3 of Harless v. First Nat'l Bank in Fairmont, 169 W.Va. 673, 289 S.E.2d 692 (1982) (hereinafter referred to as "Harless II"), we recognized that "[t]he tort of retaliatory discharge carries with it a sufficient indicia of intent, thus, damages for emotional distress may be recovered as a part of the compensatory damages." "The essence of the cause of action is the wrongful and deliberate discharge of the employee who chooses to exercise some substantial public policy right." Id. at 702.
CAMC argues that "there was absolutely no evidence presented by the plaintiff to support an award for emotional distress." Specifically, CAMC refers to our discussion of the type of emotional distress suffered by the plaintiff in Harless II:
Plaintiff testified that as a result of the firing he suffered emotional distress by way of humiliation and lost self-confidence and trust. He was unable to properly eat and sleep and had to take medication for his nervous condition and depression. His wife corroborated this condition and indicated that after the firing he isolated himself from his family and friends and was extremely depressed and listless.
289 S.E.2d at 699-700. CAMC contends that, in this case, the Maces offered no such testimony, and thus, "there was no basis whatsoever for the jury to award damages for emotional distress."
Counsel for Mace admits that "[t]here was no direct evidence of emotional distress in this case ...", but suggests that "there was ample evidence from which the jury could, and apparently did, infer such suffering."
In reviewing this particular component of the damage award, our primary concern is one we also expressed in Harless II, which is "that a claim for emotional distress without any physical trauma may permit a jury to have a rather open-hand in the assessment of damages." Id. at 702. "Additionally, a jury may weigh the defendant's conduct in assessing the amount of *634 damages and to this extent emotional distress damages may assume the cloak of punitive damages." Id. (Emphasis added.) A variation on this theme may have occurred in this case, with punitive damages assuming the cloak of emotional distress damages. Perhaps this occurred because although there was no actual physical evidence of emotional injury, the jury nevertheless felt compelled to both compensate Mace and punish CAMC.
However, as we noted above, the jury also awarded Mace $125,000.00 in punitive damages. Significantly, the damages issue was bifurcated so that if the jury found in favor of Mace on the claim of retaliatory discharge, punitive damages would be argued separately. This was done because Mace could not recover punitive damages if the jury found in his favor only on the breach of contract issue.
Interestingly enough, counsel for Mace did not favor bifurcation, while CAMC's counsel believed it would be less confusing to the jury. We believe that Mace undoubtedly benefitted from the bifurcation simply because of the narrow focus which was given to this punitive aspect of the case. The propriety of bifurcation in a case such as this is not an issue now before us, nor is it appropriate for this Court to make it an issue, given the fact that the trial judge suggested it in order to simplify matters for the jury. Moreover, neither party is now lodging any specific complaints directed at the bifurcation. However, we believe that in this case, the bifurcation on the damages issue increased the likelihood that the jury would award punitive damages.
In spite of the admitted paucity of evidence of emotional distress, Mace received $50,000.00 in damages. We realize that perhaps it is inevitable that a jury which finds that an employer has willfully and unreasonably discharged an employee will sometimes award damages, regardless of the evidence, simply because the award is perceived as a method by which to provide both compensation for the plaintiff and punishment for the defendant. In fact, we basically conceded this point in Harless II when we recognized the latitude that a jury is given when assessing emotional distress awards.
We will not disturb the jury's award of $50,000.00 for emotional distress. However, given the circumstances present in this case, we do not believe that the additional award of $125,000.00 in punitive damages is warranted. When the jurors were instructed to award the plaintiff herein damages for emotional distress, they were most likely unaware that they would subsequently be permitted to make an award for the express purpose of punishing the defendant, should they choose to do so. However, "[t]he mere existence of a retaliatory discharge will not automatically give rise to the right to punitive damages." Id. at 703.
The right to punitive damages is incumbent upon proof of further evidence of egregious conduct by the employer. Id. "`Punitive or exemplary damages are such as, in a proper case, a jury may allow against the defendant by way of punishment for wilfulness, wantonness, malice, or other like aggravation of his wrong to the plaintiff, over and above full compensation for all injuries directly or indirectly resulting from such wrong.' Syllabus Point 1, O'Brien v. Snodgrass, 123 W.Va. 483, 16 S.E.2d 621 (1941)." Syl. pt. 4, Harless v. First Nat'l Bank in Fairmont, 169 W.Va. 673, 289 S.E.2d 692 (1982). In syllabus point 5 of Harless II, we stated that:
Because there is a certain openendedness in the limits of recovery for emotional distress in a retaliatory discharge claim, we decline to automatically allow a claim for punitive damages to be added to the damage picture. We do recognize that where the employer's conduct is wanton, willful or malicious, punitive damages may be appropriate.
As examples of the requisite types of willful or malicious conduct, we explained that "[s]uch a situation may arise where the employer circulates false or malicious rumors about the employee before or after the discharge or engages in a concerted action of harassment to induce the employee to quit or actively interferes with the *635 employee's ability to find other employment." Id. at 703, n. 19. No such evidence was presented in this case.
For the foregoing reasons, we overturn the appellee's punitive damage award, but affirm the jury's determinations regarding awards for lost wages and emotional distress. This case is remanded to the Circuit Court of Kanawha County for entry of an order consistent with this opinion.
Affirmed in part; reversed in part; and remanded.
WORKMAN, Justice, dissenting:
The majority opinion gets my vote for the Court's most outrageous decision of the year.[1]
It is incredible that when the person in charge of filling drug carts with drugs to be administered to patients, filling employee prescriptions, copying doctor's written orders for patients, and preparing intravenous solutions for patients comes to work in such a drug-impaired condition that he cannot by his own admission perform his duties, the majority believes he cannot be fired.
It is also incredible that this Court as recently as July 1990 in the case of Twigg v. Hercules Corp., 185 W.Va. 155, 406 S.E.2d 52 (1990), enunciated the law governing this precise issue, yet the majority fails to even mention it. But most incredible of all is that the author of the majority opinion in the instant case wrote a ringing dissent in Twigg in which he said "I believe that an employer is entitled to know whether his employees are using drugs which may affect their work performance and, in some cases, the safety of others at work." 185 W.Va. at 161, 406 S.E.2d at 58.
This Court in McClung v. Marion County Comm'n, 178 W.Va. 444, 450-51, 360 S.E.2d 221, 228 and Syl. Pt. 3 (1987), held that an employer may defeat a retaliatory discharge claim by showing that the employee would have been discharged even in the absence of the protected conduct. (The protected conduct at issue in this case was Mace's wage claim under the Veterans Reemployment Rights Act at least one year prior to the drug screen request.) The record is replete with evidence that the reason for Mace's discharge was his insubordination in refusing to submit to a drug screen. But even if it could be demonstrated that CAMC was ill-motivated in its actions, they were still entitled under Twigg to demand that this employee submit to drug screening and, in the event of his refusal to do so, to fire him. Clearly under McClung, the employee could have been discharged even absent the protected conduct.
In Twigg, this Court made it abundantly clear that drug testing by an employer is permissible "where it is conducted by an employer based upon reasonable good faith objective suspicion of an employee's drug usage or where an employee's job responsibility involves public safety or the safety of others." 185 W.Va. at 158, 406 S.E.2d at 55. Both factors existed here.
Not only did employee Mace acknowledge ingesting fifteen prescription drugs, but his conduct in the workplace was bizarre. According to unrefuted testimony, his words were slurred, he was staggering, his eyelids were drooping, and he could barely sit up. He had also received written warning as a result of belligerent and discourteous behavior to fellow employees, and on the basis that he went about muttering obscenities and refused a direct order from his supervisor. Given Mace's duties, it is beyond dispute that his "job responsibility involve[d] public safety or the safety of others."
This certainly was not the case of an employee being unfairly singled out for a random drug-test. CAMC's reasonable suspicion of drug use[2] was confirmed by Mace himself. CAMC had an obligation to *636 its patients to pursue the drug screen to verify both the quantity and the nature of the drugs ingested by Mace to determine whether he should participate in the hospital Employee Assistance Program, and to determine whether he was improperly removing drugs at his disposal from the hospital pharmacy. The sheer quantity of drugs revealed by Mace, together with his further admission that some of the drugs were actually drugs prescribed for his wife, gave CAMC a bona fide reason for insisting on the drug screen.
Another critical fact regarding the drug screen is that Dr. Willard Pushkin of Employee Health, the person who first suggested the need for the drug screen, had no knowledge whatsoever of any problem between Robert Mace and the hospital administration, nor was he aware of the wage claim which Mace claims to have been the motivating force behind the drug screen demand. Moreover, Dr. Pushkin also testified that he had previously recommended other hospital employees be screened for drugs and that rehabilitation was provided to those individuals.
The lower court should have granted CAMC's motion for a directed verdict on the issue of retaliatory discharge as CAMC had a valid nondiscriminatory reason for discharging Mace and he could have been discharged even in the absence of his wage claim.
Ironically, if a drug-impaired employee were to cause injury or death to a patient, this Court would be most eager to uphold a multi-million dollar verdict against a hospital for its negligence in permitting the employee to be in a position to cause such harm. We should be fair enough to this hospital and to the general public to give them the opportunity to assure that drugimpaired employees are not put in a position to injure innocent people.
NOTES
[1] Mace states that he did not deal with the scheduled drugs, or controlled substances, which were kept under lock and accessible only to pharmacists and the charge nurse on each floor.
[2] Mace explains in his brief that he demanded to be paid in full for the time between November 8 and December 9, 1985, when he was available for work but CAMC refused to reemploy him. On March 27, 1987, after the United States Attorney's Office became involved in collection efforts on Mace's behalf, CAMC offered to compromise Mace's $1,083.85 claim for $657.60. Mace refused, and CAMC subsequently paid Mace the full amount of his claim on May 18, 1987.
[3] Mace chose not to take the next step in the grievance procedure, which was to submit the issue to arbitration. This point was not raised in the briefs submitted to this Court and was mentioned at the trial below only during CAMC's argument to the jury on the punitive damages issue. When asked during oral argument before this Court about the fact that Mace did not continue to follow the normal grievance procedure and had instead elected to file this lawsuit, counsel for Mace suggested that Mace had "had all the CAMC justice he could take."
[4] See generally, Personnel Policy Manuals as Legally Enforceable Contracts: The Implied-in-Fact Contract  A Limitation on the Employer's Right to Terminate at Will, 29 Washburn L.J. 368, 390 (1990).
[5] Mace's attorney told the jury that, "[h]e is also entitled to an additional 30 percent or  33 and a third percent of that figure [lost wages] of the value of his benefits. You can add those to the wages he missed in compensation."
[1] Of course, the year isn't over yet. We still have the September term.
[2] It is immaterial that the employee here claimed that all fifteen drugs he was taking were prescribed medications, and thus may not have been illegally obtained. The purpose of employer drug screening where justified is not to ferret out unlawful criminal activity. It is to determine if one is drug-impaired.