445 S.E.2d 219

**Andrew P. DZINGLSKI, Appellee,**

v.

**WEIRTON STEEL CORPORATION, Appellant.**

**No. 21888.**

Supreme Court of Appeals of West Virginia.

Submitted May 3, 1994.

Decided May 26, 1994.

Franklin D. Cleckley, Morgantown, Michael W. McGuane, Thomas C. Schultz, Wheeling, for appellee.

Carl N. Frankovitch, Mark A. Colantonio, Frankovitch & Anetakis, Weirton, for appellant.

NEELY, Justice.

This is an appeal from a jury verdict and judgment in the Circuit Court of Brooke County against Weirton Steel Corporation ["Weirton Steel"] in the amount of $500,000 for the tort of outrage and intentional infliction of emotional distress. The judgment was based upon the circumstances surrounding an investigation by Weirton Steel into alleged improprieties on the part of the plaintiff below, Andrew P. Dzinglski, while he worked as a management employee at Weirton Steel in 1984.

Mr. Dzinglski had worked at National Steel Corporation for 25 years when National Steel became Weirton Steel through an Employee Stock Ownership Plan ["ESOP"] in January 1984. Under the ESOP, all ownership of Weirton Steel was vested in its employees, who took substantial reductions in pay and benefits in exchange for company stock.

In the course of the negotiations surrounding the creation of the ESOP, the Independent Steelworkers Union, which represented company employees, related to management several cost-saving measures the Union would seek to implement should the ESOP be concluded successfully. These measures comprehended the removal of both management employees deemed detrimental to the new ESOP company as well as the elimination of various outside contractors whose services, in the Union's opinion, could be performed less expensively by Weirton Steel employees.

Accordingly, upon completion of the ESOP in January 1984, Valley Systems, Inc., an industrial cleaning company that had performed various cleaning jobs at Weirton Steel's facilities, was discontinued as an outside contractor, Weirton Steel opting to use its own employees for the same tasks. At about the same time, Richard McKittrick, Weirton Steel's General Supervisor of Plant Security, received a series of anonymous telephone calls implicating the plaintiff below, Mr. Dzinglski, in taking kickbacks from Valley Systems. Mr. Dzinglski, as general foreman of the Strip Steel labor gang, had had daily dealings with Valley Systems, approving invoices for work performed and purchases made by Valley Systems.

Eventually, the anonymous caller identified himself as Tim Lawson, a salaried foreman who had worked under Mr. Dzinglski in the Strip Steel Department. According to Mr. Lawson, while Weirton Steel's contract with Valley Systems required Weirton Steel to pay an hourly charge for laborers, Mr. Dzinglski frequently approved payment for salaried supervisory employees who performed no actual work at Weirton Steel. Mr. Lawson also accused Mr. Dzinglski of accepting gratuities in the form of food, fixtures, meals and travel from Valley Systems and of allowing Valley Systems to use Weirton Steel's own supplies and equipment to perform work. To corroborate these charges, Mr. Lawson named two former Valley Systems employees, Charles Fraizer and William Baxter.

Mr. McKittrick thereupon met with Mr. Lawson and William Doepken, Weirton Steel's Vice President for Legal and Public Affairs. Having been apprised of Mr. Lawson's accusations, Mr. Doepken deemed the charges against Mr. Dzinglski sufficiently serious to warrant an investigation. Mr. Doepken was appointed to head the investigation.

When, in late May 1984, Mr. Doepken and Mr. McKittrick confronted Mr. Dzinglski with the substance of Mr. Lawson's allegations, Mr. Dzinglski denied any wrongdoing. Mr. Doepken then informed Mr. Dzinglski that Weirton Steel had decided to suspend Mr. Dzinglski with pay while the charges were investigated. Mr. Dzinglski's suspension was consistent with the Weirton Steel policy that whenever allegations were raised about management employees, the employee would be suspended with pay during the investigation.

As part of the investigation, Weirton Steel's internal audit department combed through Weirton Steel's own records in order to probe the charges of overbilling and phantom employees. Weirton Steel staunchly maintains that no one, other than those persons directly involved in the investigation, was informed by Weirton Steel of Mr. Lawson's accusations.

Mr. McKittrick interviewed Mr. Baxter and Mr. Frazier, the Valley Systems employees identified by Mr. Lawson as corroborative witnesses, taking notes of his interviews for the preparation of internal memoranda. According to Mr. McKittrick, these memoranda were routed to only four people: Mr. Doepken, Robert Loughhead, president of Weirton Steel and Mr. McKittrick's immediate supervisors, William Wetzel and Alan Moran.

With regard to gratuities allegedly taken by Mr. Dzinglski from Valley Systems, Mr. Baxter, general superintendent and office manager at Valley Systems, testified that on instructions from the CEO and owner of Valley Systems, Eugene R. Valentine, Mr. Baxter: (1) picked up an order of 50 pounds of bacon and took it to Mr. Dzinglski; (2) picked up a bathroom vanity and delivered it to Mrs. Dzinglski; (3) picked up bolt cutters and delivered them to Mr. Dzinglski for the purpose of cleaning out lockers of former Weirton employees; (4) purchased a camera for Mr. Dzinglski and delivered it to Mr. Dzinglski; (5) doctored invoices to cover the cost of repairs for a Valley System Kubota machine damaged at the Weirton Steel mill by Weirton Steel; (6) periodically took different Weirton employees to lunch on Valley System's tab; and (7) on one occasion provided Mr. Dzinglski access to a motel room at a local Holiday Inn paid for by Valley Systems. Mr. Baxter also testified that Mr. Dzinglski allowed Valley Systems to use supplies from Weirton Steel's storeroom in the performance of their jobs.

Mr. Fraizer, who worked as a supervisor and performed various administrative duties at Valley Systems, stated that on instructions from Mr. Valentine, Mr. Fraizer delivered a camera to Mr. Dzinglski. Mr. Fraizer also revealed that Valley Systems periodically took Weirton Steel storeroom supplies and used them in the performance of their jobs. According to Mr. Frazier, Mr. Valentine occasionally took Mr. Dzinglski out to lunch.

Mr. Valentine did not deny giving various gratuities to Mr. Dzinglski, including steaks, 50 pounds of bacon, various meals and cases of wine and beer, but claimed that it was common business practice for a subcontractor to give such gifts to the contractor to maintain good relations. And although admitting he purchased a camera for Mr. Dzinglski, Mr. Valentine maintained that the camera was for work-related purposes only. As for the bathroom vanity, Mr. Valentine contended he bought it for the purpose of remodelling the bathroom in the trailer that Valley Systems used as an office on the Weirton premises.

In July 1984, Mr. Doepken met with Mr. Dzinglski and reviewed the substance of all allegations against Mr. Dzinglski. Mr. Dzinglski flatly denied any wrongdoing. Although some of the allegations made by Mr. Lawson had been confirmed by Mr. Baxter and Mr. Fraizer and some evidence of irregularities in Valley Systems billing was uncovered by Weirton Steel's auditors, the accusations levelled by Mr. Lawson were never fully substantiated nor was there evidence of criminal wrongdoing by Mr. Dzinglski.

Nonetheless, the mere allegations of improprieties against a management employee raised concerns on the part of Weirton Steel about Mr. Dzinglski's ability to function effectively as a labor manager. On 31 October 1984, Mr. Dzinglski was discharged honorably.

Mr. Dzinglski filed an initial complaint in October 1985, alleging he had been wrongfully discharged from his employment with Weirton Steel. Mr. Dzinglski's amended complaint, filed in October 1987, asserted claims of: (1) wrongful discharge; (2) promissory estoppel; (3) breach of duty of good faith and fair dealing; (4) defamation; (5) negligent investigation; (6) violation of public policy; and (7) punitive damages. At the 13 May 1992 pretrial conference, two weeks before trial, Mr. Dzinglski asserted a claim for the tort of outrage or intentional infliction of emotional distress.

The trial court granted Weirton Steel's motion for directed verdict on Mr. Dzinglski's claims of wrongful discharge, promissory estoppel and good faith and fair dealing, finding, as a matter of law, that Mr. Dzinglski was an at-will employee and no public policy had been violated by his discharge. The court also granted Weirton Steel's motion for directed verdict on Mr. Dzinglski's claims of defamation, premised on the allegedly untrue and defamatory allegations in Mr. McKittrick's memoranda and the allegedly resultant rumors circulating in the mill that smeared and defamed Mr. Dzinglski.

In addition, the court granted Weirton Steel's motion for directed verdict on Mr. Dzinglski's claim of negligent investigation, finding that, as a matter of law, a qualified privilege existed as to the internal investigation coordinated by Weirton Steel and the resulting memoranda and that there was no evidence of publication beyond the privilege. The court also found that the defamation claim was barred by the statute of limitations.

The court denied Weirton Steel's motion for directed verdict on Mr. Dzinglski's claim based on the tort of outrage and intentional infliction of emotional distress. The jury returned a verdict for Mr. Dzinglski in the amount of $500,000 compensatory damages

and $150,000 punitive damages. The trial court struck the award of punitive damages in its ruling on Weirton Steel's post-trial objection to the punitive damages.

Weirton Steel assigns two errors: first, the trial court erred in failing to direct a verdict, enter judgment n.o.v. or award a new trial in favor of Weirton Steel on Mr. Dzinglski's claim for the tort of outrage or intentional infliction of emotional distress and, second, the trial court erred in allowing Mr. Dzinglski to amend his complaint to plead a claim for the tort of outrage or intentional infliction of emotional distress because this claim was never pled and was barred by the one-year statute of limitations. In a cross-assignment of error, Mr. Dzinglski argues that the trial court erred in setting aside Mr. Dzinglski's punitive damages award. We address these assignments of error in turn.

## I.

Weirton Steel contends that the trial court erred in failing to direct a verdict in its favor because there was insufficient evidence as a matter of law that the investigation into Mr. Dzinglski's alleged improprieties constituted a tort of outrage. We agree.

## A.

■ We first defined the tort of outrage or intentional infliction of emotional distress in Syllabus pt. 1, *Harless v. First National Bank in Fairmont,* 169 W.Va. 673, 289 S.E.2d 692 (1982):

> One who by extreme or outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for bodily harm.

This definition is patterned after Section 46 of the *Restatement (Second) of Torts* which requires that the conduct be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.* at 704–05, 289 S.E.2d 692.

Because of its heavy emphasis on the severity of the defendant's behavior, the tort of outrage is a somewhat nebulous cause of action.[1] Unlike most intentional torts, the relative ease of establishing the victim's injury is not counterbalanced by any specific definition of the behavior that will lead to liability. Instead, liability for intentional infliction of emotional distress arises whenever the defendant's conduct is found to be outrageous. *See* Daniel Givelber, *The Right to Minimum Social Decency and the Limits of Evenhandedness: Intentional Infliction of Emotional Distress by Outrageous Conduct,* 82 Colum.L.Rev. 42, 51 (1982). The *Restatement's* description of the prohibited conduct, provides very little guidance to the potential defendant:

> Liability has been found only where the conduct has been so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

Despite their failure to define outrageousness clearly, the *Restatement's* comments do suggest the contexts in which a suit for intentional infliction of emotional distress is most appropriate. Comment e states: "The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests." Even though the comments and illustrations in the *Restatement* do not specifically mention the employer-employee relationship, commentators and courts alike have cited comment e to justify use of this tort in the employment at will context. *Givelber, supra* at 43; *Alcorn v. Anbro Eng'g,* 2 Cal.3d 493, 468 P.2d 216, 86 Cal.Rptr. 88 (1970); *Contreras v. Crown Zellerbach Corp.,* 88 Wash.2d 735, 565 P.2d 1173 (1977).

There are two conflicting lines of authority in cases involving a discharged at-will employee alleging the tort of outrage against his employer. Some courts refuse to weigh the inherently coercive element of an employer's firing of an at will employee, commonly citing comment g of the *Restatement* which states: "The actor is never liable ... where he has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress." *See e.g., Novosel v. Sears, Roebuck & Co.,* 495 F.Supp. 344 (E.D.Mich.1980); *Brooks v. Carolina Tel. & Tel.,* 56 N.C.App. 801, 290 S.E.2d 370 (1982). This language has led these courts to conclude that the employer could not be liable for intentional infliction of emotional distress because by firing the employee the employer did no more than exercise his legal rights. Other courts, however, reject this argument, maintaining that the tort of outrage also can arise from conduct surrounding the discharge. *See, e.g., M.B.M. Co. v. Counce,* 268 Ark. 269, 596 S.W.2d 681, 688 (1980); *Agarwal v. Johnson,* 25 Cal.3d 932, 603 P.2d 58, 160 Cal.Rptr. 141 (1979).

Although in *Harless,* 169 W.Va. at 696, 289 S.E.2d at 705, we conceded that there may be situations where an employee's termination cannot be fitted into a retaliatory discharge cause of action yet a cause of action will fall within the tort of outrageous conduct as against his employer, we found a claim for the tort of outrageous conduct essentially duplicative of a claim for retaliatory discharge. In the case before us now, the task falls upon us to delineate more precisely the conduct that is relevant in a wrongful discharge action, the primary protection for at will employees, and the conduct that underlies the tort of outrage.

In *Farmer v. Carpenters,* 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977), the United States Supreme Court recognized that two separate actions could arise from an employment discrimination claim: the first action, for wrongful discharge, involved the employment discrimination itself—in that case, the firing of the plaintiff for dissident intra-union political activities; the second, for intentional infliction of emotional distress, involved the

---

1. In this section, we are indebted to James F. Bleeke for his excellent analysis of the tort of outrage or intentional infliction of emotional distress in his article entitled *Intentional Infliction of Emotional Distress in the Employment at Will Setting: Limiting the Employer's Manner of Discharge,* 60 Ind.L.J. 366 (1985).

outrageous manner in which the discrimination, to wit, the discharge, was implemented—frequent public ridicule, incessant verbal abuse, threats and intimidations. The *Farmer* Court concluded that these separate causes of action could coexist and that recovery was possible for each separately.

In *Magnuson v. Burlington Northern, Inc.,* 576 F.2d 1367 (9th Cir.1978), *cert. denied,* 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978), a discharged employee, claiming that he was the victim of a conspiracy among railroad personnel to blame him for a collision and that the conspiracy was effected through abuse of the railroad's investigatory process, attempted to avoid the limited wrongful discharge remedies under the Railway Labor Act by basing his suit on intentional infliction of emotional distress. In the same vein as *Farmer, supra,* the court, however, found that no intentional infliction of emotional distress claim would lie because the plaintiff's emotional distress resulted *solely* from his discharge itself, rather than from the outrageous manner by which the discharge was effected.

In *Viestenz v. Fleming Cos.,* 681 F.2d 699 (10th Cir.1982), *cert. denied,* 459 U.S. 972, 103 S.Ct. 303, 74 L.Ed.2d 284 (1982), an employee, alleging that he was pressured into admitting that he stole merchandise from the employer's store and then was discharged for that admission, brought actions for wrongful discharge and intentional infliction of emotional distress against his employer. The court, reasoning that the employee's harm resulted from the fact of his discharge rather than from any improper conduct by the employer, refused to allow the plaintiff to recover under the tort of outrage.

■ In essence, then, the prevailing rule in distinguishing a wrongful discharge claim from an outrage claim is this: when the employee's distress results from the fact of his discharge—e.g., the embarrassment and financial loss stemming from the plaintiff's firing—rather than from any improper conduct on the part of the employer in effecting the discharge, then no claim for intentional infliction of emotional distress can attach. When, however, the employee's distress results from the outrageous manner by which the employer effected the discharge, the employee may recover under the tort of outrage. In other words, the wrongful discharge action depends solely on the validity of the employer's motivation or reason for the discharge. Therefore, any other conduct which surrounds the dismissal must be weighed to determine whether the employer's manner of effecting the discharge was outrageous.

### B.

This Court has yet to decide a case where a defendant's conduct was found to be sufficiently outrageous to satisfy the requirements for the tort of outrage or intentional infliction of emotional distress. In an employment context, shortly after the plaintiff's husband in *Cook v. Hecks, Inc.,* 176 W.Va. 368, 342 S.E.2d 453 (1986) was discharged from his position as president of a subsidiary company, the plaintiff, who worked as a salesperson in the same company, also was fired. The parent company claimed that the plaintiff's discharge arose from her and her husband's association with a competitor of the parent company. This Court, quoting the *Restatement* test articulated in *Harless,* determined that the manner in which the plaintiff was fired (which the plaintiff contended caused her humiliation, embarrassment and health deterioration) did not constitute outrageous conduct.

Likewise, in *Harless,* the plaintiff was demoted from his position as an at will office manager in a bank when he reported the bank was overcharging customers on loans. Although the plaintiff was reinstated to his former position when the illegal practices were substantiated, the bank summarily discharged the plaintiff for allegedly sequestering confidential bank files, giving false and misleading information to regulatory officials, and failing to get along with other bank employees. This Court determined the conduct of the Bank did not reach the level of outrageous conduct that would support a claim for the tort of outrage. However, in *Harless,* we let stand the claim for unlawful discharge based on retaliation for conduct that furthers public policy, i.e., encouraging honesty among bankers.

■ The facts of the case before us do not rise to the level of conduct necessary to satisfy the tort of outrage. When Mr. Lawson apprised Weirton Steel of improprieties by one of its management employees, Weirton Steel did what it is the right and indeed the obligation of any employer to do: it investigated the allegations of impropriety. The actions taken by Weirton Steel in its investigation were wholly appropriate under the circumstances: (1) an internal audit and interviewing of Valley Systems employees; (2) suspension of Mr. Dzinglski, with pay, pending the investigation; (3) preparation of internal memoranda setting forth the results of interviews and the internal audit; and (4) private meetings with Mr. Dzinglski apprising him of the allegations made against him and affording him the opportunity to affirm or deny such allegations.

It is difficult to see how these actions, all of which were conducted in the context of an internal investigation into company mismanagement could conceivably constitute outrageous conduct. We find that the manner by which Weirton Steel effected Mr. Dzinglski's discharge was far from outrageous and that Weirton Steel's motivations for the discharge were proper. Although we are not unsympathetic to the distress doubtless suffered by Mr. Dzinglski, we find that the distress stemmed from the discharge itself and not from the investigatory process coincident with the discharge. Therefore, the trial court erred in finding that Weirton Steel's investigation into Mr. Dzinglski's alleged improprieties constituted the tort of outrage.

## C.

■ Weirton Steel also argues that the trial court erred in denying Weirton Steel's motion for a directed verdict on Mr. Dzinglski's claim for the tort of outrage because of the lower court's finding that, as a matter of law, Weirton Steel's investigation was subject to a qualified privilege. We agree.

■ Section 46 of the *Restatement (Second) of Torts* recognizes that a privilege may bar the right to recover under the tort of outrage. Comment g to Section 46 provides:

[C]onduct, although it would otherwise be extreme and outrageous, may be privileged under the circumstances. The actor is never liable, for example, where he has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such instance is certain to cause emotional distress.

■■ This Court has recognized the existence of a qualified privilege as a defense to a tort claim. In *Crump v. Beckley Newspapers*, 173 W.Va. 699, 320 S.E.2d 70 (1984), we explained:

Qualified privileges are based upon a public policy that it is essential that true information be given whenever it is reasonably necessary for the protection of one's own interests, the interests of third persons or certain interests of the public.... A qualified privilege exists when a person publishes a statement in good faith about a subject in which he has an interest or duty and limits the publication of the statement to those persons who have a legitimate interest in the subject matter ... [A] bad motive will defeat a qualified privilege defense ...

In essence, then, a defendant's conduct is subject to a qualified privilege when he acts to protect or advance his own legitimate interests, the legitimate interests of others or the legitimate interests of the public. *Crump*, 173 W.Va. at 707, 320 S.E.2d at 78–79.

In the present case, the trial court found, as a matter of law, that Weirton Steel's investigation into Mr. Dzinglski's alleged improprieties was subject to a qualified privilege. The court also found, as a matter of law, that Weirton Steel did not publish the findings of its investigation beyond the scope of the privilege and therefore did not defame Mr. Dzinglski. Such a finding is consistent with the *Crump* proposition that a qualified privilege attaches to actions designed to protect the defendant's legitimate interests, such as, in this case, when a company is informed that one of its own management employees may be engaged in improper conduct.

We therefore find that the trial court made no error in finding that a qualified privilege attached to the communications made during the investigation and that these communica-

tions concerning the investigation did not proceed beyond the scope of the privilege. As a matter of law, then, Weirton Steel could not have been guilty of outrageous conduct by its investigation into Mr. Dzinglski's alleged improprieties.

## II.

Although our reversal of the lower court's judgment makes it unnecessary to address the two other errors assigned by Weirton Steel and the one assigned by Mr. Dzinglski, we find the issues raised sufficiently important that we shall nonetheless decide them to provide for the Bar a clarification of the underlying law.

### A.

■ Weirton Steel contends that the lower court erred in permitting Mr. Dzinglski to amend his complaint in order to assert a claim for intentional infliction of emotional distress two weeks before trial and six and one-half years after the action was begun and that it was unfairly prejudiced by the amendment. We disagree.

■ Rule 15, *W.V.R.C.P.*, which governs amended and supplemental pleadings, provides that "leave [to amend pleadings] shall be freely given when justice so requires." As we stated in the syllabus of *Bennett v. Owens*, 180 W.Va. 641, 378 S.E.2d 850 (1989):

> The purpose of the words 'leave [to amend] shall be freely given when justice so requires' in Rule 15(a) . . . is to secure an adjudication on the merits of the controversy as would be secured under identical factual situations in the absence of procedural impediments; therefore, motions to amend should always be granted under Rule 15 when: (1) the amendment permits presentation of the merits of the action; (2) the adverse party is not prejudiced by the sudden assertion of the subject of the amendment; and (3) the adverse party can be given ample opportunity to meet the issue.

In this case, the outrage claim arose from the same set of facts as those in the original complaint—Weirton Steel's conduct surrounding the investigation into Mr. Dzingl-

ski's alleged improprieties. Furthermore, notwithstanding the eleventh-hour insertion of the outrage claim, Weirton Steel never moved for a continuance in order to conduct discovery on the claim. *See State v. Barker*, 169 W.Va. 620, 289 S.E.2d 207 (1982) (even if claim of surprise were proper, the appellant's failure to move for a continuance waived his right to one.); *Martin v. Smith*, 190 W.Va. 286, 438 S.E.2d 318 (1993) (even if unanticipated expert testimony did in fact prejudice defendant's case, defendant could have easily moved for a continuance in order to secure a comparable expert witness). "Unless the amendment of the pleading will prejudice the opposing party by not affording him an opportunity to meet the issue, it should be allowed so as to permit an adjudication of the case on its merits." *Employers Fire Ins. Co. v. Biser*, 161 W.Va. 493, 497, 242 S.E.2d 708, 711 (1978).

Accordingly, we hold that the trial court made no error in permitting Mr. Dzinglski to amend his complaint.

### B.

■ Weirton Steel further contends that the trial court erred in failing to find that Mr. Dzinglski's claim of outrage was barred by the statute of limitations. We disagree.

■ This Court has adopted the rule followed by federal courts under identical provisions of Rule 15, *F.R.C.P.*: amendments relate back to when the cause of action sought to be added "grow[s] out of the specified conduct of the defendant which gave rise to the original cause of action." *Roberts v. Wagner Chevrolet–Olds, Inc.*, 163 W.Va. 559, 563, 258 S.E.2d 901, 903 (1979) (citing 3 Moore's Federal Practice § 15.15[3] ). If, however, "the supplemental pleading creates an entirely new cause of action based on facts different from those in the original complaint, the amended pleading will not relate back for statute of limitations purposes." *Jones v. Jones*, 184 W.Va. 297, 301, 400 S.E.2d 305, 306 (1990).

In this case, there were no new facts alleged when the outrage claim was added to the amended pleading. The entire action centered from the start in Weirton Steel's

actions against Mr. Dzinglski in its investigation into his alleged improprieties. Therefore, we find the outrage claim relates back to the original cause of action and is not barred by the statute of limitations.

### C.

As a cross-assignment of error, Mr. Dzinglski asserts that the trial court erred in denying Mr. Dzinglski the punitive damages awarded by the jury after the jury, in answering a special interrogatory, found that Weirton Steel's actions were wanton, oppressive, and reckless, with a conscious disregard for Mr. Dzinglski's rights. We disagree.

In *Mace v. Charleston Area Medical Center Foundation, Inc.*, 188 W.Va. 57, 422 S.E.2d 624, 633 (1992), we expressed our concern that in cases where damages for emotional distress are sought, "a claim for emotional distress without any physical trauma may permit a jury to have a rather open-hand in the assessment of damages." In *Wells v. Smith*, 171 W.Va. 97, 297 S.E.2d 872 (1982), we recognized that in permitting recovery for emotional distress without proof of physical trauma where the distress arises out of the extreme and outrageous conduct intentionally caused by the defendant, damages awarded for the tort of outrageous conduct are essentially punitive damages. Therefore, in many cases emotional distress damages serve the policy of deterrence that also underlies punitive damages.

By allowing the jury to consider punitive damages, the trial court permitted the jury to stack punitive damages upon punitive damages, thereby effectively imposing two punitive damage verdicts against Weirton Steel for the same acts. The trial court's decision to dismiss Mr. Dzinglski's claim for punitive damages correctly avoided this double recovery.

Accordingly, for the reasons stated above, we find that the trial court erred in finding that Weirton Steel's conduct rose to the level required for the tort of outrage. We therefore reverse.

Reversed.