461 S.E.2d 149

**Connie TANNER and Marjorie Legg, Plaintiffs Below, Appellees,**

v.

**RITE AID OF WEST VIRGINIA, INC., Defendant Below, Appellant.**

**No. 22647.**

Supreme Court of Appeals of West Virginia.

Submitted May 10, 1995.

Decided July 19, 1995.

David W. Johnson, Lewis, Friedberg, Glasser, Casey & Rollins, Charleston, for appellant.

Robert A. Taylor, Masters & Taylor, Charleston, for appellees.

WORKMAN, Justice:

The Appellant, Rite Aid of West Virginia, Inc. ("Rite Aid"), appeals from a jury verdict in favor of the Appellees, Connie Tanner and Marjorie Legg. Following the verdict, Rite Aid filed a motion for judgment notwithstanding the verdict, or in the alternative, for a new trial, which the circuit court ultimately denied. We initially denied review in this case, but thereafter granted an appeal solely on the issue of damages. Rite Aid asserts several assignments of error in the proceedings below and asks that judgment be entered in its favor. We discern no error from the record, however, and we hereby affirm the judgment and the circuit court's related rulings in all respects.

## I. STANDARD OF REVIEW

In *Barefoot v. Sundale Nursing Home*, 193 W.Va. 475, 457 S.E.2d 152 (1995), we recently stated as follows:

'In reviewing a trial court's ruling on a motion for a judgment notwithstanding the verdict, it is not the task of the appellate court reviewing facts to determine how it would have ruled on the evidence presented. Its task is to determine whether the evidence was such that a reasonable trier of fact might have reached the decision below. Thus, in ruling on a motion for a judgment notwithstanding the verdict, the evidence must be viewed in the light most favorable to the nonmoving party. If on review, the evidence is shown to be legally insufficient to sustain the verdict, it is the obligation of this Court to reverse the circuit court and to order judgment for the appellant.' Syllabus Point 1, *Mildred L.M. v. John O.F.*, 192 W.Va. 345, 452 S.E.2d 436 (1994).

Syl.Pt. 1, *Barefoot*, 193 W.Va. at 479, 457 S.E.2d at 156.

In performing the required analysis under West Virginia Rule of Civil Procedure 50(b), we do not examine the credibility of the witnesses, conflicts in the testimony, or the weight of the evidence. Rather, the appropriate inquiry is stated in syllabus point six of *McClung v. Marion County Commission*, 178 W.Va. 444, 360 S.E.2d 221 (1987):

'In determining whether there is sufficient evidence to support a jury verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved.' Syl. pt. 5, *Orr v. Crowder*, 173 W.Va. 335, 315 S.E.2d 593 (1983), *cert. denied*, 469 U.S. 981, 105 S.Ct. 384, 83 L.Ed.2d 319 (1984).

Syl.Pt. 6, *McClung*, 178 W.Va. at 446, 360 S.E.2d at 223.

While our review is limited by these considerations, it is nevertheless de novo. *Barefoot*, 193 W.Va. at 482, 457 S.E.2d at 159. Having established the legal prism through which we must view this matter, we now set forth the primary evidence adduced by the Appellees at trial.[1]

## II. FACTUAL DEVELOPMENT

Connie Tanner was a forty-four-year-old mother of four at the time of the incident which formed the basis for the complaint. Her mother, Appellee Marjorie Legg, was a seventy-five-year-old widow at the time. Neither of the Appellees had ever been accused of any criminal misconduct prior to the events herein.

The incident in question occurred in August 1991. Ms. Tanner, along with her ten-year-old daughter Brandi, had just retrieved Marjorie Legg from the hospital, where she had been undergoing treatment for depres-

1. We would note that the parties presented dramatically different versions of what did or did not occur. For instance, Rite Aid asserted that the incident in question never even took place. This obviously was a jury issue which was resolved against Rite Aid, and, as previously stated, we limited this appeal to the issue of damages.

sion.[2] The three family members then proceeded immediately to Rite Aid, entered the store, and went straight to the pharmacy to have Ms. Legg's prescription filled. While Ms. Legg sat down and waited for the prescription to be filled, Ms. Tanner found some soap on sale and decided to purchase it. When the prescription was filled, Ms. Tanner asked the pharmacy clerk if the soap could be purchased at the pharmacy register rather than at the check-out line at the front of the store.[3] The clerk rang up the items, and the items were paid for and placed in a single bag. Ms. Tanner took the bag, and the three began to leave the store.

Ms. Legg and Brandi exited the store just a few steps ahead of Ms. Tanner. Before Ms. Tanner could reach the outside of the store, however, a male Rite Aid employee stopped her by "roughly" grabbing her shoulder and ceasing her forward motion.[4] The employee informed Ms. Tanner that she would have to step back into the store, stating "[o]ne of you has taken something you haven't paid for, and you're going to have to come back in the store." Ms. Tanner immediately became nervous, and the employee again stated "[g]et your grandmother, get your daughter and get back in the store. Get them back in the store." According to

the Appellees, two male Rite Aid employees conducted the ensuing investigation.

Ms. Tanner testified to being both scared and embarrassed and stated that one employee had a "hateful" look on his face and was speaking quite loud. Ms. Tanner stated that she then yelled out to her mother that both she and Brandi would have to return to the store because of the theft allegation. Ms. Legg testified that she knew by the tone of her daughter's voice and the employee's voice that she was required to return to the store. When the three family members re-entered Rite Aid, one employee took them to the front of the store near the check-out counter. Ms. Tanner stated that one of the employees was "angry" and "in a state of rage...."

One employee again accused Ms. Tanner of shoplifting and said "[l]et's have the bag." Ms. Tanner started to remove the bag from her hand and the employee grabbed it from her. The employee searched the bag, noticed the soap, and asked to see the purchase receipt. While Ms. Tanner could not locate the receipt, the pharmacy clerk confirmed that Ms. Tanner had paid for the merchandise. Both Ms. Tanner and Brandi testified, however, that the employee continued to insist in a loud and abusive fashion that one of the three had shoplifted merchandise and that he was "going to find it."[5]

2. Rite Aid's expert witness was Dr. Russell Voltin, a board certified neurologist and psychiatrist. He testified as follows concerning Ms. Legg's hospitalization:

 A. This July of 1991, she was hospitalized at CAMC and noted to be suffering from depression and was also noted not to have followed up with prescribed outpatient psychiatric care. In August of 1991, she was hospitalized at Highland Hospital for depression, treated with antidepressant medication, *showed a favorable response* and was discharged to outpatient care. (Emphasis added).

3. According to Ms. Tanner, the line at the front of the store was crowded, and she wanted to get her mother home as soon as possible, given her recent release from the hospital.

4. Rite Aid apparently only detains suspected shoplifters in two instances. In the first instance, a Rite Aid employee must actually observe the customer taking and concealing merchandise. In the second instance, a customer will trigger the store's "EAS" machine. An EAS machine was in place at the front of the store in the instant case. When customers walked

through the machine to exit the store, an alarm sounded and a light on the machine flashed if the machine detected the presence of a special magnetic sticker. The sticker is placed on many items that are frequently subject to pilfering. The products with tags are demagnetized by the check-out clerk at the time of purchase. Both Ms. Legg and Ms. Tanner testified that the machine did not activate when they exited the store.

At trial, Rite Aid officials, relying in part on training materials, discussed the proper procedure to be followed when the EAS is triggered. These procedures include, inter alia, the following: (1) never accuse, threaten or otherwise act in an aggressive manner toward the customer; (2) be courteous and discreet; (3) never grab the customer's bag; (4) never touch the customer; (5) advise the customer that a tag may have not been demagnetized and ask them to return to the counter; and (6) if an individual is stopped erroneously, apologize for any inconvenience.

5. Rite Aid makes much of some confusion on the part of the Appellees about the timing and substance of the events that occurred. For instance, Ms. Tanner was confronted on cross-examination

The employee then placed his hand into Ms. Legg's pocket, who was shaking at the time. Ms. Tanner insisted that he stop, and then turned her mother's pockets inside out so that he could see she had taken no merchandise. Ms. Tanner then patted her own pockets as well. The employee, however, continued to insist that something had indeed been stolen. He then attempted to take Ms. Legg's purse. Ms. Legg stamped her cane twice in disapproval. Ms. Tanner, however, both out of fear and a desire to resolve the incident for her mother's sake, took both her mother's and her own purse, removed the items therein, and showed the employee the contents. According to Ms. Tanner, the employee then gave some indication that Brandi "was next." Ms. Tanner stated that she looked at Brandi and saw the most frightened look she had ever witnessed. At this point, Ms. Tanner, regardless of the consequences, made a decision to leave the store. Ms. Tanner estimated that the incident transpired over a period of twenty to thirty minutes.

Upon reaching the car, Ms. Legg became very upset because she had forgotten to buy her aspirin. Ms. Legg convinced her daughter to return to the store to buy the medicine. Ms. Tanner very reluctantly agreed to do so, and in the process of purchasing the aspirin, she overheard a Rite Aid employee state that the EAS machine had been going on and off all day. No apologies were ever extended to the Appellees by Rite Aid officials.

Throughout the events discussed above, the store was still crowded. Ms. Tanner stated that there were at least two lines of people and that the three family members were placed right next to the onlooking customers.[6] The Appellees were not only concerned about the obvious embarrassment of being confronted in this manner in the presence of strangers. For instance, Ms. Legg testified that she was fearful that someone she knew might be witnessing the incident.[7] She was particularly concerned that her son, Patrick Legg, Investigative Bureau Chief for the City of Charleston Police Department, would enter the store or otherwise learn of the incident.

There was a great deal of testimony concerning the effect that the incident had on the Appellees. Ms. Tanner testified that "[i]t was the scariest moment in ... [her] life." When she arrived home, her son testified that she burst into tears. She also became physically ill, enduring a bout of vomiting. Later that evening, Ms. Tanner picked up her husband from work. He testified that "she was crying and upset ... [and] shaking." During the months following the incident, and to some extent to this day, Ms. Tanner has experienced (1) bouts of crying (sometimes waking her from a sound sleep); (2) a loss of appetite; (3) nervousness; (4) difficulty sleeping; and (5) weight loss.

Family members testified that Ms. Tanner was, indeed, a different person following the incident. Her son stated that she began to neglect her housekeeping. Ms. Tanner, her

---

with previous deposition testimony wherein she stated that she was allowed to leave the store following the pharmacy clerk's verification of the purchase. The events herein were obviously traumatic and occurred over two-and-one-half years prior to trial. In fact, Ms. Tanner attributed her difficulty in remembering the above details to the effect that the encounter had on her at the time. Consequently, we do not think it unreasonable for the jury to have credited the substance of the Appellees' testimony concerning the sequence and substance of the relevant events.

We are troubled, however, by another matter. In a case this term, *McCormick v. Allstate Insurance Company*, No. 22551 (W.Va. filed May 4, 1995), we entered an unpublished order which directed counsel to "refrain from the use of intemperate language in documents filed with this

Court." *Id.* In Rite Aid's opening brief, it characterizes the emotional distress suffered by the Appellees to be nothing short of "whining." We do not countenance these types of *ad hominem* personal attacks. Accordingly, we caution counsel, and all members of the Bar who practice before this Court, that such inappropriate references will not be tolerated in the future.

6. The waiting customers were obviously intrigued by the spectacle. Ms. Tanner testified that an onlooking woman even commented "[o]oh, honey, looks like they've got them a couple." Ms. Tanner testified that at that point that she "knew that everybody in the store probably thought ... [they] were thieves."

7. Brandi did in fact see a young schoolmate among the crowd of onlooking customers.

son and her husband also testified that while she previously enjoyed shopping a great deal, especially with her mother, she practically ceased the activity for fear of being wrongly accused again. She stated that when she did go to the grocery store, she would leave her purse in the car to avoid suspicion. There was also testimony that while she was previously involved in fund raising activities at her daughter's school, she ceased the activity for fear of rumors that might circulate about the incident or general mistrust that others might harbor about her honesty.

Ms. Legg suffered similar ill effects. Ms. Tanner testified that her mother was "shaking all over" and was "hysterical" during the drive home. As for general manifestations, there was testimony that Ms. Legg suffered from: (1) a loss of appetite; (2) weight loss; (3) vomiting; and (4) disturbing dreams related to the incident.[8] As noted above, she was particularly upset about what Patrick Legg, her police-officer son, would think. Patrick testified that when he saw his mother following the incident, she was extremely upset. Ms. Legg herself testified that she "went all to pieces." Patrick even felt it necessary to take his mother to his own home, where she stayed with him for two days. He noted that his mother's behavior changed after the incident, particularly with regard to him, and perhaps, he surmised, out of a sense of shame:

A. Well, she quit calling me, quit coming to the house or wanting to come to the house, and would talk—she used to talk at great length on the phone. Her conversations were real short, and I would go down to see her, and it was a short visit because she would either say she was tired or whatever.

Patrick and Ms. Legg also stated that she ceased some of her previous activities. For instance, she resigned as president of her tenant council and as a caller at bingo. Her primary fear, like her daughter's, was that an individual she knew either witnessed or heard of the incident and that "people wouldn't trust ... [her] any more." She also stated that while she was truly fond of shopping with her daughter and associating with others prior to the incident, she largely ceased these activities following the events at Rite Aid.

While the Appellees produced no expert testimony at trial, Dr. Voltin, as noted above, testified on Rite Aid's behalf. Dr. Voltin examined the Appellees and testified that within a reasonable degree of medical probability, neither Appellee suffered from any problem related to or caused by the incident at Rite Aid. He also testified that he believed the Appellees manifestations were "an exaggeration beyond that which would be expected following the alleged incident." In regard to Ms. Legg specifically, Dr. Voltin testified, that her symptoms were present even prior to the incidents at Rite Aid and related to her depression. As for Ms. Tanner, Dr. Voltin stated that she too had a pre-existing anxiety disorder and had exhibited similar symptoms following the death of her brother some years earlier.

Following a two-day trial, the case was submitted to the jury on March 23, 1994. The following three causes of action were presented to the panel: (1) intentional infliction of emotional distress (the tort of outrage); (2) battery; and (3) false imprisonment. After deliberating for approximately two hours, the jury sent a note to the judge stating "[w]e would like you to tell us about battery again." The judge reread the previous instructions on battery and the jury again retired to continue their deliberations. After approximately two more hours of deliberation, the jury returned a verdict. While the jury indicated on the verdict forms (one for each Appellee) that they found for the Appellees on both the false imprisonment and outrage claims, and for Rite Aid on the battery claim, they marked "NO" on the verdict form next to the general interrogatory that asked "[w]as there any injury proximately caused to the plaintiffs." Nevertheless, in indicating the $12,000 in compensatory damages to be awarded to both Appellees in the next interrogatory, the jury found that the damages "were proximately caused by the defendant's conduct. . . ." The jury

---

8. It appears that on cross-examination Ms. Legg testified that she had suffered from the same or similar symptoms in the past as a result of her depression.

made an additional award of $18,000 in punitive damages to each Appellee after specifically finding that Rite Aid was "guilty of malice, oppression, or wanton, willful, or reckless misconduct or criminal indifference to the civil obligation affecting the rights of plaintiffs."

The judge noted the inconsistency on causation in the verdict form and explained the problem to the jury. She then further instructed the jury as follows:

I'm not suggesting to you how you fill out the verdict form or what you wish to do, but I am going to ask you to retire back to the jury room to reconsider this, okay? Because you have indicated that there were no injuries proximately caused, and then down here on 8, you've indicated that there were damages which were proximately caused. So it needs to be consistent, and you need to go back and review that.

If you have any questions of me, I'll be happy to come back and read you some further instructions.

After a few minutes, the jury returned the verdict forms, having marked "YES" and crossed out "NO" in response to the proximate cause inquiry, thus finding proximate cause. The circuit court then entered judgment for the Appellees on March 30, 1994. The Appellant filed its motion for judgment notwithstanding the verdict, or in the alternative for a new trial, on April 7, 1994. The circuit court denied the motion on June 13, 1994. We initially denied review in this case, but thereafter granted an appeal solely on the issue of damages. We did so in order to address a very important principle relating to the tort of outrage.[9] This issue, which is largely a question of first impression, deals with the necessity of expert testimony to prove the causation and severity elements for

intentional infliction of emotional distress. As set forth more fully herein, we discern no error in the proceedings below. Consequently, we hereby affirm the judgment and the circuit court's challenged rulings.

## III. THE LAW

### A. The Necessity of Expert Testimony:

Our current jurisprudence on the tort of outrage has its genesis in *Harless v. First National Bank in Fairmont*, 169 W.Va. 673, 289 S.E.2d 692 (1982). In syllabus point six of *Harless*, we stated as follows: " 'One who by extreme or outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for bodily harm.' Syllabus pt. 6, *Harless v. First National Bank in Fairmont*, 169 W.Va. 673, 289 S.E.2d 692 (1982)." Syl. pt. 1, *Dzinglski v. Weirton Steel Corp.*, 191 W.Va. 278, 445 S.E.2d 219 (1994).

This formulation of the cause of action is identical to that which is contained in *Restatement (Second) of Torts* § 46(1) (1965).[10] For this reason, the jurisprudence and comments attached to § 46 have substantially influenced our subsequent development of this claim. For instance, we have made repeated reference in our prior cases, in whole or in part to comment (d), which states as follows:

d. *Extreme and outrageous conduct.* The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his

---

9. Even in light of our order limiting review to the issue of damages, the Appellant has asserted some assignments of error that clearly relate more to liability. Given the narrow nature of our review, we do not address these alleged errors.

10. We suggested in *Harless* that a plaintiff alleging the tort of outrage must prove the following four elements:

'One, the wrongdoer's conduct was intentional or reckless.... Two, the conduct was outrageous and intolerable in that it offends against the generally accepted standards of decency and morality.... Three, there was a causal connection between the wrongdoer's conduct and the emotional distress. Four, the emotional distress was severe.'
*Id.* at 694–95, 289 S.E.2d at 704 (quoting *Womack v. Eldridge*, 215 Va. 338, 342, 210 S.E.2d 145, 148 (1974)).

conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. *Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'*

*The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through* which *irascible tempers may blow off relatively harmless steam.*

*Id.* (emphasis added); *see Courtney v. Courtney*, 190 W.Va. 126, 437 S.E.2d 436 (1993) (*"Courtney II"*) (quoting comment (j) concerning the nature of severe emotional distress); [11] *Courtney v. Courtney*, 186 W.Va. 597, 413 S.E.2d 418 (1991) (*"Courtney I"*); *Kanawha Valley Power Co. v. Justice*, 181 W.Va. 509, 383 S.E.2d 313 (1989).

The reason that we have demanded such strict proof of unprecedented and extreme misconduct was perhaps best stated in *Keyes v. Keyes*, 182 W.Va. 802, 805, 392 S.E.2d 693, 696 (1990): "Especially where no physical injury accompanies the wrong, the tort of outrage is a slippery beast, which can easily get out of hand without firm judicial oversight." [12] *Id.*

The crux of Rite Aid's argument is that a plaintiff must adduce expert testimony to prove causation and severe emotional distress under the tort of outrage. Rite Aid's argument is based almost exclusively on an isolated quotation from our decision in *Courtney II* which provides as follows:

> However, where the claim is only one for severe emotional distress from outrageous conduct, the emotional distress forms the

---

**11.** Comment (j) provides in pertinent part as follows:

> *j. Severe emotional distress.* The rule stated in this Section applies only where the emotional distress has in fact resulted, and where it is severe. Emotional distress passes under various names, such as mental suffering, mental anguish, mental or nervous shock, or the like. It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea. It is only where it is extreme that the liability arises. Complete emotional tranquillity is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. The intensity and the duration of the distress are factors to be considered in determining its severity. Severe distress must be proved; *but in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed. For example, the mere recital of the facts in Illustration 1 above goes far to prove that the claim is not fictitious.*

The distress must be reasonable and justified under the circumstances, and there is no liability where the plaintiff has suffered exaggerated and unreasonable emotional distress, unless it results from a peculiar susceptibility to such distress of which the actor has knowledge. See Comment f.

It is for the court to determine whether on the evidence severe emotional distress can be found; *it is for the jury to determine whether, on the evidence, it has in fact existed.*

*Restatement, supra* § 46 cmt. j (emphasis added); *see also id.*, cmt. k ("Normally, severe emotional distress is accompanied or followed by shock, illness, or other bodily harm, *which in itself affords evidence that the distress is genuine and severe.*") (Emphasis added).

**12.** Mere numbers alone, however, can never be a justification for refusing or unnecessarily limiting a cause of action in tort: "It is the business of the law to remedy wrongs that deserve it, even at the expense of a 'flood of litigation,' and it is a pitiful confession of incompetence on the part of any court of justice to deny relief on such grounds." W. Page Keeton et al., *Prosser and Keeton on The Law of Torts* § 12 at 56 (5th ed. 1984).

basis of the cause of action. *To recover damages for a claim based solely on emotional distress, such emotional distress must not only be severe, but must manifest distinct psychological or mental patterns that are commonly recognized by experts. In some instances, physical manifestations may occur.* *Id.* at 130, 437 S.E.2d at 440 (emphasis added).[13]

As an initial matter, one must recognize that *Courtney II* did not present the question addressed herein. Second, Rite Aid reads *Courtney II* in overbroad fashion and does not take into account our pre-existing, analogous case law.

First, one must examine exactly what we were addressing in *Courtney II.* The only substantial assignment of error in *Courtney II* was that the circuit court had erroneously ruled that the statute of limitations barred the plaintiff's claims for assault and battery and intentional infliction of emotional distress. *Id.* at 133, 437 S.E.2d at 443. No issue was raised about proof for the tort of outrage, because the case was dismissed below as a matter of law on purely legal grounds. The above-cited quotation from *Courtney II* was meant to demonstrate the difference between a *cause of action* for intentional infliction of emotional distress as opposed to the *damages* for emotional dis-

tress that one might recover as an adjunct to another substantive tort, such as assault and battery. *Id.* at 130, 437 S.E.2d at 440. We then used this analysis in an attempt to demonstrate that the tort of outrage seeks recovery for a "personal injury," thus requiring resort to a two-year statute of limitations. *Id.* at 133, 437 S.E.2d at 443. The above-quoted language relied upon by Rite Aid was, at most, merely an attempt to illuminate the distinction. For that reason, it can only be considered as dicta.[14]

Second, it becomes clear that Rite Aid's position is not well-taken when one examines our precedent dealing with the analogous area of proof for emotional distress as a damage element contained within another substantive tort. For instance, in *Slack v. Kanawha County Housing & Redevelopment Authority*, 188 W.Va. 144, 423 S.E.2d 547 (1992), the plaintiff asserted claims for invasion of privacy, retaliatory discharge, and civil conspiracy. The circuit court granted one of the defendants judgment notwithstanding the verdict as to $30,000 in emotional distress damages that were parasitic to plaintiff's substantive claim for invasion of privacy. The circuit court reasoned that the emotional distress damages could not stand because "the evidence of such damages con-

---

**13.** We also stated that "[c]ertainly, at the very least, this type of severe emotional distress will exhibit mental and emotional damages readily recognizable by qualified experts." *Courtney II,* 190 W.Va. at 132, 437 S.E.2d at 442. We would note that no authority was cited for this proposition and that no extended analysis was performed. Interestingly enough, we overruled a decision that was discussed in *Courtney II,* in part, because it "made no attempt to analyze cases from other jurisdictions to determine how they" viewed the particular question at issue. *Id.*

**14.** Further, we have not been particularly equivocal when we have determined that expert testimony is necessary to prove analogous causes of action. For instance, in *Heldreth v. Marrs,* 188 W.Va. 481, 425 S.E.2d 157 (1992), we determined that a plaintiff could recover, without the necessity of physical injury, for negligent infliction of emotional distress when he or she witnesses a close relative suffer a critical or fatal injury at the hands of a negligent defendant. *Id.* at 485, 425 S.E.2d at 161. In regard to that cause of action, we stated as follows:

We emphasize, however, that in addition to showing that the plaintiff's emotional distress was reasonably foreseeable, and that a cause and effect relationship between the emotional distress and the accident existed, *the plaintiff must also prove the seriousness of the emotional distress through the use of medical and psychiatric evidence.*

*Id.* at 491, 425 S.E.2d at 167 (emphasis added).

Furthermore, had we intended to use the quoted language in *Courtney II* for the purpose asserted by Rite Aid, we had a recent, quintessential opportunity to do so in *Hines v. Hills Department Stores, Inc.,* 193 W.Va. 91, 454 S.E.2d 385 (1994). In *Hines,* we were faced with a suit by former department store cashiers alleging, in part, that the defendant had committed the tort of outrage. We recognized in *Hines* that none of the cashiers had received counselling or presented expert testimony to prove emotional distress. Nevertheless, rather than relying on what Rite Aid might term the "black letter law" contained in *Courtney II,* and quickly disposing of the case, we reversed the matter on other grounds following an extended analysis. *Hines,* 193 W.Va. at 96, 454 S.E.2d at 390.

sisted solely of the plaintiff's testimony, uncorroborated by any medical or expert testimony." *Id.* at 151, 423 S.E.2d at 554.

In reversing that ruling, we stated that "[w]e have not required plaintiffs who have suffered emotional distress damages to buttress such claims by corroborative evidence at the peril of having their claims dismissed as a matter of law." *Id.* at 152, 423 S.E.2d at 555; *see also, e.g., Mace v. Charleston Area Medical Ctr. Found., Inc.,* 188 W.Va. 57, 67, 422 S.E.2d 624, 634 (1992) ("In spite of the admitted paucity of evidence of emotional distress ... [as an adjunct to a retaliatory discharge claim,] [w]e will not disturb the jury's award of $50,000.00 for emotional distress."); *Criss v. Criss,* 177 W.Va. 749, 751, 356 S.E.2d 620, 622 (1987) ("Although the appellant's claim for damages for emotional distress ... [as an adjunct to a claim for assault and battery] would have been strengthened by supporting medical or psychological evidence, the testimony offered by the appellant and her grandmother was sufficient to raise issues for jury determination.") [15]

■ If anything, then, our analogous existing case law indicates that expert testimony is not required in every case to prove the causation and severity elements for intentional infliction of emotional distress. Indeed, *Harless* itself, the genesis for this cause of action in West Virginia, fails to make mention of any such requirement. Restatement § 46(1) and its comments, upon which we have placed great reliance in the past, also omit any such mandate. In formulating our rule for expert testimony in the context of the tort of outrage, however, we feel compelled to examine authority from other jurisdictions. Our research has disclosed a split of authority.

One line of authority suggests that expert testimony is rarely required for proof of intentional infliction of emotional distress. *See, e.g., Richardson v. Fairbanks North Star Borough,* 705 P.2d 454, 457 n. 6 (Alaska 1985) ("Expert medical testimony may be the most effective method of demonstrating the existence of severe emotional distress, but it should not be the exclusive means of ascertaining a party's mental state.") This approach has garnered some support from the commentators. One of the seminal articles on the tort of outrage states that a claim for intentional infliction of emotional distress "is much cheaper to bring than a negligence action since there is no need for experts either with respect to causation or extent of injury." Daniel Givelber, *The Right to Minimum Social Decency and the Limits of Evenhandedness: Intentional Infliction of Emotional Distress by Outrageous Conduct,* 82 Colum.L.Rev. 42, 51 (1982); *see* Angela M. Elsperger, Comment, *Damages—Intentional Infliction of Emotional Distress in the Workplace: Defining Extreme and Outrageous Conduct in North Dakota's Job Description,* 70 N.D.L.Rev. 187, 191 n. 43 (1994) (stating "experts are not needed to show causation or extent of injury because the extremity and outrageousness of the conduct presumes damage").

A second line of authority, however, requires expert testimony [16] in every case where the tort of outrage is alleged. *See, e.g., Kazatsky v. King David Mem. Park, Inc.,* 515 Pa. 183, 197, 527 A.2d 988, 995 (1987) (stating that "it is unwise and unnecessary to permit recovery to be predicated on an inference based on the defendant's 'outrageousness' without expert medical confirma-

---

**15.** We are cognizant of our suggestion in *Courtney II* that where the recovery for emotional distress is ancillary or parasitic to another substantive tort, the emotional distress need not be as severe, and thus might survive on a lesser showing, than when one seeks recovery exclusively for emotional distress via the tort of outrage. *See Courtney II,* 190 W.Va. at 130, 437 S.E.2d at 440.

**16.** The circuit court's inquiry should take all facts and reasonable inference in the light most favorable to the plaintiff and then determine if the injury's cause and its severity are within the common understanding of reasonable jurors. It would obviously be prudent for plaintiff's counsel to seek such a determination at the pretrial stage and prior to any discovery deadline set by the circuit court. Should counsel wait for the circuit court to rule on the question in the context of a defense motion for summary judgment or for directed verdict, it may be too late to employ the necessary expert should the circuit court deem one to be necessary.

tion that the plaintiff actually suffered the claimed distress").

 We think the first line of authority is better reasoned and more consistent with our jurisprudence and the Restatement. Like that authority, we do not adopt a bright-line rule that expert testimony is never required to prove the tort of outrage. Although expert testimony may be a helpful and effective method of proving emotional distress and its relationship to the act complained of, it is not always necessary.[17] A determination by the trial court as to whether a plaintiff has presented sufficient evidence absent expert testimony such that the jury from its own experience can evaluate the claim, its causal connection to the defendant's conduct and the damages flowing therefrom will not be disturbed unless it is an abuse of discretion.

We note that this approach has found support among both the commentators and other jurisdictions. For instance, one commentator has stated as follows:

> If the evidence in a given case [asserting a claim for intentional infliction of emotional distress] is such that the jurors, or judge, in a bench trial, can from their own experiences evaluate both the substance of the injury claimed and its probable relationship to the defendant's misconduct, the plaintiff may prove causation without the aid of expert testimony....

> When prima facie proof of the fact of injury or causes involves matters beyond the competency of ordinary lay persons, expert witnesses must be employed.

Marilyn Minzer et al., *Damages in Tort Actions* § 6.12[3], [4] (1989) (footnotes omitted); *see McKnight v. Simpson's Beauty Supply, Inc.*, 86 N.C.App. 451, 454, 358 S.E.2d 107, 109 (1987) ("Our holding is simply that the jury was capable of determining without the aid of a physician or psychiatrist whether plaintiff was shocked and upset following his abrupt, unexplained dismissal and whether such feelings were caused by defendant's conduct."); *Chandler v. Denton*, 741 P.2d 855, 867 (Okla.1987) ("In most cases, jurors from their own experience are aware of the extent and character of the disagreeable emotions that may result from a defendant's outrageous conduct. Severe emotional distress may be shown either by physical manifestations of the distress or by subjective testimony."); *Bennett v. City Nat'l Bank & Trust Co.*, 549 P.2d 393, 399 (Okla.Ct.App. 1975) ("If from their own experience, jurors are aware of the extent and character of the disagreeable emotions that may result from the defendant's conduct, then such is a matter of general knowledge."); *Hackney v. Woodring*, 424 Pa.Super. 96, 104, 622 A.2d 286, 290 (1993), *rev'd*, 539 Pa. 266, 652 A.2d 291 (1994) ("The emotional reactions discussed in comment j to § 46 predate the advent of psychiatry and can readily be established without the testimony of one learned in that area of medical science....

---

17. We think West Virginia Rule of Evidence 702 is helpful by analogy here. Rule 702 provides as follows:

> **Rule 702. Testimony by Experts.** If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

W.Va.R.Evid. 702.

Helpfulness to the jury, then, is the touchstone of Rule 702. While expert testimony is often presumed to be helpful to the jury, "[t]his presumption vanishes where the testimony concerns matters within the everyday knowledge and experience of a lay juror." 2 Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 7–2(A)(2) (3rd ed. 1994). Justice Cleckley summarizes the inquiry as follows: "Under Rule

702, expert testimony is inadmissible as to a matter which obviously is within the common knowledge of jurors because such testimony, almost by definition, can be of no real assistance." *Id.; accord* Syl. Pt. 3, *McCroskey v. Proctor*, 175 W.Va. 345, 332 S.E.2d 646 (1985); *United States v. Harris*, 995 F.2d 532 (4th Cir.1993).

Under some circumstances, expert testimony may still be helpful beyond this limit where the testimony would clearly "add precision and depth to the ability of the trier of fact to reach conclusions about subjects which lie well within common experience." 2 Cleckley, *supra* § 7–2(A)(2). Similarly, it would have been helpful in the instant case to assist the trier of fact in ascertaining to what degree the plaintiff's emotional distress was the proximate result of the tort, given her prior history of emotional problems. There may be many instances, like that of the instant case, where expert testimony may be helpful but not mandatory.

While the average juror may not have personally experienced the extreme fright, humiliation, embarrassment and loss of self-esteem to which Hackney testified, these feelings are within the realm of common understanding which all jurors bring with them to the jury box.")[18]

Further, as stated by the leading commentators, often the flagrancy and "enormity" of the defendant's misconduct "adds especial weight to the plaintiff's claim, and is in itself an important guarantee that the mental disturbance which follows is serious and not feigned." Keeton et al., *supra* § 12 at 57 and 56 (stating also that "the elimination of trivialities calls for nothing more than the same common sense which has distinguished serious from trifling injuries in other fields of the law"); *Restatement, supra* § 46 cmt. j (stating that "in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed").[19]

Certainly this analysis does not preclude a defendant from having an expert examine the plaintiff and testify to the results and conclusions concerning the examination. Indeed, beyond cross-examination, this type of testimony is the principal defensive weapon to counter the plaintiff's testimony. Were we to adopt a different approach, a defendant would be left in the difficult position of attempting to counter a plaintiff's subjective testimony on causation and severity of the distress. The expert must not, however, be permitted to usurp the province of the jury on these two elements, and the circuit court should so instruct the panel and limit the testimony where necessary. We have no doubt that a properly instructed jury can sort out the competing testimony.

In applying these principles to the instant case, we conclude that the lower court did not abuse its discretion in determining that the nature of the plaintiffs' claim and their evidence in support thereof was such that the jury could properly evaluate it without expert testimony. The jury accepted the evidence which demonstrated that the Appellees, inter alia, (1) were publicly accused of criminal wrongdoing, (2) endured a lengthy, humiliating public search of their persons and belongings, (3) were repeatedly labeled as thieves, and (4) were ridiculed by onlooking customers. We think the emotions and manifestations that they experienced as a result were well within the common understanding of the average juror and were properly submitted to the panel. Accordingly, an expert witness' direct or supplementary testimony on behalf of the Appellees to prove causation or severity of distress in these circumstances was not required. We thus discern no error from the Appellees' failure to adduce such testimony.

B. Summary Disposition of Miscellaneous Assignments of Error:

Rite Aid asserts some additional arguments that merit at least a summary discussion.

1. Duplicative Recovery

First, Rite Aid asserts that the award of punitive damages here constituted an impermissible double recovery. Rite Aid cites *Dzinglski v. Weirton Steel Corp.*, 191 W.Va. 278, 445 S.E.2d 219 (1994), in support of this argument. In *Dzinglski* we reviewed a jury's award to the plaintiff on a claim for intentional infliction of emotional distress in the amount of $500,000 in compensatory

---

**18.** The decision by the Superior Court in *Hackney* was a thinly-veiled invitation for the Pennsylvania Supreme Court to revisit the inflexible rule that it laid down in *Kazatsky*, 515 Pa. at 197, 527 A.2d at 995, discussed above regarding the necessity of expert testimony. As indicated by the summary reversal of *Hackney*, the invitation was refused.

**19.** Professor Givelber has persuasively analyzed the proposition in the following manner:

Since it is the moral quality of defendant's conduct, and the inferences to be derived from it, that dominate the proof, the plaintiff can typically present evidence sufficient to support a finding of all elements of the tort without the heavy reliance on expert witnesses and exhaustive discovery that are so characteristic of many personal injury cases. *If the defendant's conduct is outrageous (a matter as to which the opinions of experts are irrelevant) this may support an inference that the defendant caused plaintiff's suffering, and that the plaintiff's suffering was severe.*

Givelber, *supra* at 64 (emphasis added).

damages and $150,000 in punitive damages. While other causes of action were alleged, the outrage claim was the only cause that reached the jury. The trial court subsequently struck the punitive damages award, and the plaintiff cross-assigned the ruling as error. We concluded, as a matter of law, that the facts in *Dzinglski* did not amount to outrageous conduct. Nevertheless, we went on to discuss the plaintiff's cross-assignment of error concerning the propriety of the circuit court's quashing of the punitive damages award. In upholding the circuit court's action, we stated as follows:

> In *Wells v. Smith*, 171 W.Va. 97, 297 S.E.2d 872 (1982), [*overruled on other grounds, Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991),] we recognized that in permitting recovery for emotional distress without proof of physical trauma where the distress arises out of the extreme and outrageous conduct intentionally caused by the defendant, damages awarded for the tort of outrageous conduct are essentially punitive damages.

*Dzinglski*, 191 W.Va. at 288, 445 S.E.2d at 229.

Neither the trial transcript, the verdict form nor Rite Aid's proposed jury instructions indicate that the argument under *Wells* was raised below. Had Rite Aid done so, the purported error could have been easily remedied before this matter was presented to the jury and finally disposed of. Given the failure to preserve and develop the putative error below, we decline to address it herein.

### 2. Excessive Damages

■■■■ Rite Aid also argues that the jury's awards for compensatory and punitive damages were grossly excessive.[20] We re-

cently restated the well-settled rule applicable to this contention in syllabus point two of *Capper v. Gates*, 193 W.Va. 9, 454 S.E.2d 54 (1994): ' " 'Courts must not set aside jury verdicts as excessive unless they are monstrous, enormous, at first blush beyond all measure, unreasonable, outrageous, and manifestly show jury passion, partiality, prejudice or corruption.' Syl.Pt., *Addair v. Majestic Petroleum Co., Inc.*, 160 W.Va. 105, 232 S.E.2d 821 (1977)." Syl. pt. 5, *Roberts v. Stevens Clinic Hosp. Inc.*, 176 W.Va. 492, 345 S.E.2d 791 (1986).' *Capper*, 193 W.Va. at 12, 454 S.E.2d at 57. After reviewing the record as a whole in the light most favorable to the Appellees, we cannot say that respective awards for $12,000 in compensatory damages and $18,000 in punitive damages meet the required standard for remand. Accordingly, we conclude that this assignment of error is not meritorious.

### IV. CONCLUSION

After careful consideration of the briefs, the record, and oral argument, we conclude that the circuit court did not err. Accordingly, based on the foregoing analysis, we hereby affirm the disposition below.

Affirmed.

BROTHERTON and RECHT, JJ., did not participate.

MILLER, Retired J., sitting by temporary assignment.

FOX, Judge, sitting by temporary assignment.

---

20. Part and parcel with this argument, Rite Aid contends that the verdict was based on passion, prejudice or mistake. Rite Aid asserts that its motion for a mistrial or for judgment in its favor should have been granted because of the short period of time that the jury took to change the inconsistent verdict form to find in favor of the Appellees. It asserts that the jury's conduct demonstrates that it "failed to follow the trial Court's instructions, and had instead decided to simply punish Appellant regardless of whether there was an injury in this case or not."

We think the more reasonable inference from the jury's speed in correcting the inconsistent verdict form is much less sinister than that pro-

pounded by the Appellant. Once instructed by the circuit court about the nature of the problem, the panel simply recognized its error and remedied it in short order. This conclusion is buttressed by the obviously careful attention that the jury paid to its duties. Runaway juries do not typically write notes to presiding judges stating "[w]e would like you to tell us about battery again." Further, we note that the jury spotted an error in the verdict form that escaped the attention of both counsel and the court. The record does not disclose that the members of the jury were anything other than attentive and faithful to their oath.